HYDROMETALS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hydrometals, Inc. v. Commissioner
Docket No. 5855-69.
United States Tax Court
T.C. Memo 1972-254; 1972 Tax Ct. Memo LEXIS 5; 31 T.C.M. (CCH) 1260; T.C.M. (RIA) 72254; December 26, 1972, Filed *5 J. W. Bullion and Buford P. Berry, for the petitioner. W. J. Blackahear, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioner's Federal income tax for the taxable year ended September 30, 1967 in the amount of $410,420.20. Certain issues raised by the parties in their pleadings have been resolved by agreement. The only remaining issue is whether petitioner should have reported $1,300,000 it received from sales in its fiscal year 1967 as taxable income in that year, or properly included the amount in its fiscal year 1966 as the price received for an assignment of future manufacturing revenues under an agreement it entered into with Cathedral Foundation, Trust C, a tax-exempt charitable trust. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Hydrometals, Inc. (hereinafter referred to as petitioner) was incorporated under the laws of the State of Illinois on July 30, 1908. Petitioner's principal place of business at the time of the filing of the petition in this case was and at all times since 1964 has been in Dallas, Texas. Petitioner keeps its books and *6 records and files its Federal income tax returns on an accrual method of accounting. Petitioner and its subsidiaries filed consolidated Federal income tax returns for its fiscal years ended September 30, 1966, and September 30, 1967, with the district director of internal revenue, Dallas, Texas. Until 1961 petitioner was basically a producer and marketer of zinc products through its Illinois Zinc Company Division. In its year ended September 30, 1965, petitioner disposed of this division. It is now a diversified manufacturer. Its stock is listed on the American Stock Exchange. During the taxable year ended September 30, 1966, petitioner's operations were conducted through two subsidiaries and six divisions. The operations of these subsidiaries and divisions during that year were as follows: (1) Hydrometals International has its headquarters at Geneva, Switzerland, and is a subsidiary serving as an international licenser for Hydro-T-Metal, an alloy developed by petitioner. This product is patented in 37 countries. (2) The Peru Mining Company is a subsidiary, the principal asset of which is all of the stock in the Shannon Mining Company. The Shannon mines at Gleeson, Arizona, *7 contain proven deposits of silver, copper, and sulphur. Although these mines had not been worked for several years, petitioner in 1966 was evaluating either (a) reactivating the mines, due to rising prices of these materials, (b) selling the properties, or (c) trading them for another manufacturing company. (3) Giller Tool Company became a wholly owned subsidiary of petitioner in 1964. Petitioner liquidated this subsidiary on September 30, 1965 and since that time its operations have been conducted by the Giller Tool Company Division. This division sells electronic kits, survival kits, safety equipment and tools, individually and in full kits, to the United States Military, local governments, and to private industry. Giller also manufactures wooden chests and foot lockers. The major purchaser for the Ciller Division during the years 1966 and 1967 was the United States Government which purchased tools from this division on bid contracts for use in Vietnam. (4) The Hydrographic Division distributes lithographic plates and chemicals to the printing trade. (5) Lenfor Products Company is a division specializing in the manufacture of precision replacement parts for automotive transmissions. *8 (6) The Thomas Beckett Company was established in 1938. Petitioner acquired this company in 1962. This division of petitioner's operations is one of the largest producers of fractional horsepower pumps in the world, shipping over 280,000 units annually. This division is also a leading manufacturer of floats and prefabricated duct work for the air conditioning industry. It also produces steel tool boxes. (7) The Roney Company was acquired as a division of petitioner in 1963. It manufactures high precision valves, fittings, gauges and couplings. Much of Roney's output goes to the butane and propane gas industry. In 1965 Roney perfected new valves for anhydrous ammonia fertilizer tanks and began marketing a new line of cylinder valves for the butane and propane gas industries, along with introducing a new underwater air valve for scuba divers. Roney's operations are reflected in the financial statements of the Beckett Division. (8) Utility Pump Company is operated as a division. This division is a leading producer of plastic recirculating pumps and float valves for the evaporative cooler industry and, like Roney, the results of its operations are reflected in the financial statements *9 of the Beckett Division. During its taxable year ended September 30, 1967, petitioner continued to conduct the operations it had conducted during its 1966 year and also acquired the U.S. Brass Company. This company manufactures and sells plumbing valves, flexible connectors and single lever faucets. Petitioner had a net operating loss carry forward from its taxable year ended September 30, 1961 of $1,928,557.59, which loss unless utilized to offset income which would otherwise be taxable, would expire during petitioner's taxable year ending September 30, 1966. The management of petitioner was aware of the possible expiration of the loss carryover from petitioner's fiscal year 1961, and numerous discussions, including discussions with representatives of its accounting firm, were had concerning a method of utilizing the loss. Several methods of utilizing the loss including the possible sale of real estate or the possible acquisition of oil and gas properties or uranium properties from which a payment in kind might be carved out and sold were considered by petitioner's management. Petitioner's accountants, Price Waterhouse & Co., advised petitioner that it should sell future receipts *10 and offset the proceeds of the sale against the net operating loss carryover which would otherwise expire. Petitioner decided to offer for sale the revenues from two of its divisions, the Beckett Division and the Giller Division which were petitioner's principal revenue-producing divisions in 1966 and 1967. Petitioner approached several prospective purchasers of its manufacturing revenues, one of which was the Cathedral Foundation, Dallas, Texas. Petitioner's officers were aware that the Cathedral Foundation had acquired with borrowed funds several oil interests in transactions involving carved out oil payments. One of petitioner's officers had on several occasions been requested by the director of the Cathedral Foundation to consider the Foundation as a prospective purchaser if petitioner should have occasion to enter into a transaction similar to the oil transactions in which the Foundation had participated. The officers of petitioner and the director of the Cathedral Foundation discussed the assignment by petitioner to the Foundation of $1,400,000 of manufacturing revenues for a discounted payment by the Foundation of $1,300,000 and also discussed the assignment to the Foundation *11 of $1,300,000 of manufacturing revenues plus an additional amount of revenues equal to interest at a specified rate on the unliquidated balance of the principal sum. Petitioner had prepared and presented to the Cathedral Foundation projections of expected reeenues from its Beckett and Giller Divisions. These projections were examined by the executive director and attorneys for the Cathedral Foundation and were reviewed by the Board of the Cathedral Foundation. The projections reflected that under the terms of petitioner's proposal to the Cathedral Foundation, the Foundation would receive $1,300,000 of manufacturing revenues together with an amount equal to 8 percent of the unliquidated balance in approximately 11 or 12 months. On September 30, 1966, petitioner and Cathedral Foundation, Trust C (hereinafter referred to as Trust C), a Catholic charitable trust, executed an instrument entitled, "Assignment of Manufacturing Revenues." On the same day petitioner also executed and delivered to Trust C, an instrument called an Assignment (hereinafter referred to as the Assignment). The "Assignment of Manufacturing Revenues" executed by petitioner (referred to as the Seller) and Trust *12 C (referred to as the Buyer) provided in part as follows: 3. Assignment. Seller, for and in consideration of the sum of $1,300,000.00 cash to it in hand paid by Buyer, receipt of which is hereby acknowledged, hereby sells, transfers, assigns and sets over to Buyer seventy percent (70%) of all Manufacturing Revenues [from its Beckett and Giller Divisions], as herein defined, that accrue to Seller after the Effective Date; subject, however, to the terms, provisions and limitations hereinafter set forth. 4. Duration of Manufacturing Revenue Payment. This Assignment shall remain in force until such time as Buyer shall have received and realized from Assigned Manufacturing Revenues actually received by Buyer after the Effective Date the Full aggregate sum of the following amounts: (a) The sum of $1,300,000.00; plus (b) An amount computed (on the basis of a 365 day year) from the date hereof on the unliquidated balance of the Primary Sum at the rate of eight percent (8%) per annum, the first such computation to be made on November 15, 1966 and subsequent computations to be made on each Application Date therefter. 5. Application of Assigned Manufacturing Revenues. All Assigned *13 Manufacturing Revenues in the hands of Buyer on the day preceding any Application Date shall on such Application Date be applied, first, to the amount provided for in Section 4(b) above to the extent accrued to such Application Date, and, second, to the reduction of the unliquidated balance of the Primary Sum. * * * 8. Covenants of Seller. Seller covenants and agrees with Buyer that until the Manufacturing Revenue Payment has been fully liquidated and discharged, (a) Seller will cause its business to be continuously operated and maintained in good and workmanlike manner and in accordance with all generally approved practices in the industry and in strict conformity with all applicable federal, state and local laws, rules and regulations and will use its best efforts not only to maintain Manufacturing Revenues at their present level but to increase Manufacturing Revenues in the future; (b) Seller will cause its facilities to be continuously maintained in a good state of repair and to be kept in good and effective operating condition and all repairs, removals, replacements, additions and improvements thereof or thereto needful to such end to be promptly made and any required *14 easements or right of ways to be obtained, whether by purchase, condemnation or otherwise; * * * (f) Seller will not assign, encumber or otherwise commit any Manufacturing Revenues or take any action or incur any obligation which will impair the ability of Seller to maintain and carry on its business and timely pay and discharge its obligations and liabilities out of Manufacturing Revenues not included in Assigned Manufacturing Revenues; * * * 9. Liability for Discharge. Buyer shall look solely to Assigned Manufacturing Revenues for liquidation and discharge of the Manufacturing Revenue Payment and Seller shall not be personally liable for the payment thereof; provided, however, nothing herein contained shall relieve Seller of its obligation to respond in damages for any breach of any representation, warranty, covenant, agreement or obligation herein contained or arising hereunder. On September 30, 1966, at the time petitioner executed the "Assignment of Manufacturing Revenues" and the Assignment, Trust C paid to petitioner the sum of $1,300,000 in cash. Trust C borrowed all of the funds with which to make the $1,300,000 payment to petitioner from Texas Bank & Trust *15 Company (hereinafter referred to as Texas Bank). Texas Bank is a large state bank doing a full service banking business in Dallas, Texas. Trust C received the $1,300,000 from Texas Bank on September 30, 1966, at which time Trust C executed and delivered to Texas Bank its note due on or before one year from date in the principal amount of $1,300,000 bearing interest at the rate of 7 percent per annum. During petitioner's fiscal years 1966 and 1967 Texas Bank was petitioner's principal banking connection. Payment of the note executed by Trust C was secured by an instrunent entitled, "Mortgage and Assignment" executed and delivered to Texas Bank on September 30, 1966. The instrument mortgaged and assigned to Texas Bank the right, title and interest of Trust C in the Assignment made to it by petitioner, which Assignment was attached as "Exhibit A" to the "Mortgage and Assignment." The transaction between petitioner and Trust C and the transaction between Trust C and Texas Bank were closed on September 30, 1966, at the offices of Texas Bank. Prior to the closing, representatives of petitioner, Trust C, and Texas Bank had approved the form of the "Assignment of Manufacturing Revenues" *16 and the instrument called an Assignment. The instrument referred to as an Assignment was prepared at the primary insistence of counsel for the Texas Bank as he thought it added to the collateral value of the "Assignment of Manufacturing Revenues." At the same time, representatives of Trust C and Texas Bank approved the "Mortgage and Assignment" executed by Trust C. No representative of petitioner was ever consulted with reference to the "Mortgage and Assignment" executed by Trust C. Petitioner's dominant motive for the transaction with Trust C was to generate income in its fiscal year 1966 to offset its net operating loss carryover that would otherwise expire. At the closing on September 30, 1966, at the offices of Texas Bank at which representatives of petitioner, Trust C, and Texas Bank were present, petitioner executed and delivered the "Assignment of Manufacturing Revenues" and the Assignment to Trust C. Trust C then executed and delivered the "Mortgage and Assignment" to the Texas Bank. Texas Bank then concurrently deposited $1,300,000 in the account of Trust C and pursuant to instructions from Trust C, Texas Bank debited the account of Trust C with $1,300,000 and credited *17 a deposit of $1,300,000 into the checking account of petitioner with Texas Bank. During its fiscal years ended September 30, 1966, and September 30, 1967, petitioner had a line of credit of $1,500,000 (reduced by borrowings from any other bank) with Texas Bank. On September 30, 1966, petitioner owed Texas Bank $675,000 and Mercantile National Bank of Dallas $275,000. At the time Trust C commenced negotiations with Texas Bank for a loan on the security of the Assignment of Manufacturing Revenues made by petitioner to Trust C, it was aware that Texas Bank was petitioner's principal banking connection. Pursuant to a representation made by petitioner to Texas Bank at the closing on September 30, 1966, petitioner, on October 3, 1966, purchased from Texas Bank three certificates of deposit each bearing interest at 5 percent and aggregating $1,300,000. One certificate for $150,000 was due on November 15, 1966, another for $150,000 was due on December 15, 1966, and the other for $1,000,000 became due on January 15, 1967. The three certificates were all issued in petitioner's name. Petitioner left them with Texas Bank and Texas Bank issued to petitioner its customary safekeeping receipt. *18 The minutes of the Senior Loan Committee of Texas Bank, dated October 4, 1966, contain the following discussion concerning the loan of $1,300,000 to Cathedral Foundation Trust C: This request for new money is to discount a gross profit payment purchased, by Cathedral Foundation Trust C, from Hydrometals, Inc. This ABC transaction is secured by assignment of 70% of the gross profits of Hydrometals, Inc. to Cathedral Foundation Trust C. In addition we are to receive a negative pledge agreement on $1,300,000.00 C/D at 5%, and held in safe keeping. In addition, we are to receive an assignment of the proceeds under government contract work if assignable, and if not an assignment of non-government contract proceeds in sufficient amount to collateralize this loan. Profitability on this line has been computed at 1.10%. APPROVED. A letter from petitioner to Texas Bank, dated October 3, 1966, contains the following statement: This will constitute our agreement with and instruction to you that the above described Certificates of Deposit are to be retained in your possession until the maturities stated individually therein, at which time we will instruct you as to all or any part, thereof *19 in one of the following two alternatives only: 1. Cashed to our account for application on our indebtedness, if any, due and owing to you at that time. 2. Cashed for reinvestment in new Certificate Deposits at your bank under similar terms and with this same letter of instruction. Petitioner paid, and Trust C received, all of the moneys it was entitled to receive under the provisions of the "Assignment of Manufacturing Reserves." The final payment was made on April 17, 1967, at which time Trust C had received $1,338,907.25 representing the total primary sum of $1,300,000 and an additional amount of $38,907.25. On its Federal income tax return for its taxable year ended September 30, 1966, petitioner reported as taxable income the sum of $1,300,000 received from Trust C. On its return for its fiscal year 1966 it showed a taxable income before net operating loss deduction of $2,059,876.72, a net operating loss deduction of $3,308,771.10 and under "taxable income" showed a loss of $1,248,894.38. Petitioner on its Federal income tax return for its fiscal year ended September 30, 1967, did not include in its gross receipts the $1,300,000 paid to Trust C under the "Assignment of *20 Manufacturing Revenues." Respondent in his notice of deficiency for petitioner's fiscal year 1967 increased petitioner's income as reported by $1,300,000 with the explanation that petitioner had erroneously omitted this amount "of gross manufacturing income which was produced and realized in this year, but which was erroneously treated as income of the taxable year ended September 30, 1966." OPINION Petitioner takes the position that its assignment of manufacturing revenues to Trust C was in both form and substance a sale for a consideration of $1,300,000. Respondent, on the other hand, contends that the transaction between petitioner and Trust C was merely an attempt by petitioner to assign future income and that petitioner must in computing its taxable income include this income in 1967 when the manufactured goods were sold. Respondent states that the transaction between petitioner and Trust C was in the nature of a loan be the Texas Bank through Trust C to petitioner bearing interest at 8 percent, the loan to be repaid by an assignment of manufacturing revenues. Both parties cite the case of , affirmed per curiaa, F. 2d (C.A. 5, *21 Aug. 18, 1972). At the time the parties filed their briefs in this case, the United States Court of Appeals for the Fifth Circuit had not rendered its opinion in the Martin case. The taxpayers in the Martin case were members of a partnership which owned an apartment building from which it received rental income. The taxpayers were also members of another partnership which during the year 1966 sustained large losses. In order to reduce their Federal income tax, the taxpayers had the partnership which owned the apartment building enter into an agreement as of December 27, 1966, to assign rents to be received in the following year to a trust in return for an advance of $225,000 from the trust to the partnership. The amount of the advance, with a secondary sum of 7 percent of the unpaid balance of the primary sum, was to be returned to the trust in the following year or years solely from the assigned rents. The taxpayers in the Martin case contended that the $225,000 constituted proceeds from the sale in the year 1966 of rents to be received by the partnership and that the $225,000 was properly includable in the partnership income in 1966, whereas the Commissioner argued that the transaction *22 was in substance a loan to the partnership and that the partnership received the rental income in 1967 and paid it over in discharge of the loan. We held that in substance the transaction constituted a loan. We pointed out that in effect the partnership merely exercised in advance its power to dispose of the income from the apartment building, and that the cases relied on by the taxpayer including the case of , were inapposite to the transaction there involved. There is no substantive distinction between the situation involved in , and that involved in the instant case. In fact, petitioner does not contend that there is any substantive distinction in fact or in law in , and the instant case, but rather contends that our decision in Martin is incorrect and should not be followed. The Martin case has now been affirmed by the United States Court of Appeals for the Fifth Circuit, the Circuit to which an appeal in this case would lie. We are therefore required in this case to follow our holding in , as affirmed by the Fifth Circuit. *23 See , affirmed (C.A. 10, 1971). However, in our view, our holding in , is correct and for that reason should be followed in this case. We hold in this case that the transaction between petitioner and Trust C was in substance merely a loan by the Texas Bank through Trust C to petitioner with repayment to be from 70 percent of the manufacturing revenues from petitioner's Beckett and Giller Divisions. Trust C did not "buy" a property which it could retain and which might fluctuate in value. All that Trust C acquired was the right to be repaid $1,300,000 with interest at 8 percent, which $1,300,000 it had in form borrowed from Texas Bank at 7 percent interest and had deposited in petitioner's bank account. Texas Bank was to be repaid by Trust C as Trust C was repaid through the assigned manufacturing revenues. Petitioner argues that it in no way guaranteed the repayment of Trust C's loan to Texas Bank. In our view the facts do not support this contention of petitioner. Petitioner left for safekeeping with Texas Bank certificates of deposit for $1,300,000 which it had purchased *24 with proceeds it received from the loan made by Texas Bank to Trust C. There was in effect an agreement between petitioner and the bank that these certificates would be maintained until Trust C had repaid the $1,300,000 to Texas Bank. Furthermore, considering the nature and type of sales made by petitioner's Beckett and Giller Divisions, the assignment of 70 percent of these sales was substantial collateral for the loan of Texas Bank to Trust C. Under thefacts shown in this record there existed no real possibility of a failure of sufficient amounts from the assigned manufacturing revenues to make the $1,300,000 repayment to Texas Bank. (C.A. 5, 1955), relied on by petitioner involved a bona fide sale and therefore has no relevance to the instant case which involves a transaction which in our view is not in substance a sale. Cf. (C.A. 5, 1968), affirming , Because of certain issues having been disposed of by agreement of the parties, Decision will be entered under Rule 50.